**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190061-U

Order filed April 14, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 9th Judicial Circuit, Knox County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0061 Circuit No. 16-CF-327 |
| TROY D. PATCH, | ) ) ) | Honorable Paul L. Mangieri, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court.
Presiding Justice O'Brien concurred in the judgment.
Justice Holdridge, dissented.

**ORDER**

¶ 1     *Held*: (1) The court did not err in denying defendant's motion to suppress methamphetamine; (2) the court did not err in denying defendant's motion to suppress his drug test results; and (3) defendant's sentence is not excessive.

¶ 2     Defendant, Troy D. Patch, appeals from his convictions for unlawful possession of methamphetamine and aggravated driving while under the influence (DUI). He argues the Knox County circuit court erred in denying his motions to suppress the methamphetamine found in his vehicle and the results of the urine and blood tests, and his sentence is excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant with unlawful possession of methamphetamine (720 ILCS 646/60(a), (b)(4) (West 2016)) and aggravated DUI (625 ILCS 5/11-501(a)(4), (d)(1)(F) (West 2016)). The charges stemmed from a collision involving a vehicle driven by defendant which resulted in the death of Drienne Kruzan, the driver of the other vehicle.

¶ 5                              A. Suppression of Methamphetamine

¶ 6        Defendant filed a motion to suppress methamphetamine found in his vehicle. He alleged in the motion that a search of his vehicle revealed a yellow plastic bag on the driver's side floorboard. A police officer seized, relocated, and opened the yellow bag. Defendant asserted the officer's actions amounted to a warrantless seizure not supported by any exception to the warrant requirement.

¶ 7        At the hearing on defendant's motion, Brian Brady of the Knox County Sheriff's Department testified that he was familiar with methamphetamine production. His training and experience included a clandestine laboratory school, which certified him in dismantling methamphetamine labs. He had also participated in live methamphetamine cooks. He was familiar with the materials involved in methamphetamine production as well as the final product.

¶ 8        Brady arrived on the scene of a traffic accident on Route 41 north of Abingdon on May 4, 2016. He did not find the yellow bag in defendant's vehicle, but believed that, because of his experience, "somebody might have called [him] over to look at it and see what [his] opinion was." Brady had heard of defendant prior to the accident, testifying: "I believe one of the Galesburg officers had given me a call and said that they'd heard that [defendant] was manufacturing meth and stealing anhydrous."

¶ 9    Brian Masters of the Illinois State Police arrived on the scene approximately four hours after the accident. Masters described the two-vehicle accident and testified that the original discovery of the yellow bag was made by Illinois State Police traffic accident reconstructionist Jonathan Kueker. Reports from the accident indicated that Kueker was the first to open the yellow bag. Masters explained that as traffic accident reconstructionist, Kueker was

> "tasked with basically investigating solely the traffic aspect of that crash where we're handling more criminal stuff. So his focus is on, you know, what's causing this crash, I mean, speed and stuff *** he would be tasked with a very important role and it would be that equations and formulas and mathematical components come together to basically come into court and testify as to who caused the crash."

¶ 10    Robert Coulter of the Illinois State Police testified that he was called to the scene of the accident for "meth lab waste that was found in the vehicle." According to Coulter, Brady showed him a yellow bag sitting on the driver's seat of a vehicle. The yellow bag contained a Ziploc bag, which, Coulter testified, contained "meth lab waste." Coulter did not know who had originally found the bag. The yellow bag had already been opened when Coulter arrived. Coulter performed a field test on the substance in the Ziploc bag. At the hearing, he initially characterized the result of that test as inconclusive, though he later conceded that the test was negative. A sample was nevertheless submitted to a laboratory for further testing. Neither Coulter nor any of the other law enforcement agents who testified at the hearing indicated that a search warrant was obtained.

¶ 11    At the close of defendant's case-in-chief, the State moved for a directed verdict, arguing that defendant had failed to make a *prima facie* case of unreasonable search or seizure. The court denied the motion, finding that a warrantless search had been conducted and that the burden of

3

proof therefore shifted to the State to demonstrate that some exception to the warrant requirement was applicable. The court added: "I haven't heard any evidence that justifies the opening of that yellow plastic bag." The State moved for a continuance so that it could subpoena Kueker. The court granted the continuance over defendant's objection.

¶ 12        When the hearing reconvened, Kueker testified that he was a traffic accident reconstruction expert for the Illinois State Police. He had been employed with the state police since 2007 and certified in accident reconstruction since 2009. When he arrived at the scene, Kueker observed "a Ford truck into the rear end of [a] Honda." He learned that the driver of the Honda was a fatal victim. He began photographing the vehicles.

¶ 13        Kueker eventually entered defendant's vehicle. When he was shown a photograph from the scene, Kueker testified: "That was a yellow bag. Wasn't sure what it was at the time. I—had a very strong odor, chemical odor, coming from it."

¶ 14        Kueker testified that he "started at the Academy in June of 2007." He had no prior law enforcement experience before that. While he did not receive "training with different divisions throughout the State Police," while at the academy, he participated in an internship where he was assigned to multiple state police divisions, including two weeks in 2006 with the Methamphetamine Response Team (MRT). On approximately 10 occasions during the internship, Kueker accompanied the MRT to clean up "meth houses." Kueker testified that the strong chemical odor he smelled in defendant's vehicle was reminiscent "of what [he] had experienced through [his] internship." Prior to becoming a full-time accident reconstructionist in 2014, Kueker worked as a trooper. The State asked if, in that time, Kueker "[h]ad *** dealt with methamphetamine on the road much[.]" Kueker responded: "On my area not really, no."

4

¶ 15    After smelling the odor, Kueker "moved [the yellow bag] from the floorboard to the seat to examine it." Kueker asked another officer to open the yellow bag so that he could photograph the contents. When asked if he could see through the yellow bag, Kueker replied: "It looked like a—couldn't totally make out what it was, but you could see it was granularly" material.

¶ 16    On cross-examination, Kueker confirmed that the yellow bag was eventually moved from the driver's seat of defendant's vehicle to the bed of that vehicle, then back to the cabin of the vehicle. A number of photographs taken by Kueker at the scene of the accident show other officers examining the contents of the yellow bag. Kueker further testified: "I asked [Brady] to [examine the bag] because he is trained in that. I am not trained in that. I believed it to be that type of substance. I had someone with experience examine it." A photograph of the yellow bag on the driver's seat shows that it was tied shut with a knot. After the officers examined the bag, they called the MRT to the scene.

¶ 17    Following arguments, the court commented that the odor Kueker detected was familiar to him from his 2006 internship. The court also referred to the yellow bag as "opaque." The court stayed its ruling on the motion for 14 days so that the parties could provide additional authority in support of their arguments. It subsequently denied defendant's motion in a written order. The court found that the seizure and search of the yellow bag was lawful under the plain view and exigent circumstances exceptions to the warrant requirement.

¶ 18    Defendant filed a motion to reopen evidence and reconsider the ruling, requesting that the court consider videos recorded at the scene of the accident that purportedly contradicted portions of Kueker's testimony. The court granted the motion to reopen evidence.

¶ 19    At the second hearing on the motion to suppress, Jason Ridlen of the Illinois State Police testified that he originally went to defendant's vehicle to retrieve insurance information. Ridlen

believed he was the first to discover the yellow bag "several minutes later."[1] Ridlen conceded, however, that he may have been called over to the vehicle after another person had discovered the bag. Ridlen was tasked with opening the bag because he was wearing gloves.

¶ 20     The video recording from Ridlen's dashboard camera, accompanied by audio recording by his body microphone, was played piecemeal throughout Ridlen's testimony. Ridlen confirmed that he said, "It smells like kerosene or something" and "I could smell it right when I opened the bag." Ridlen could not recall smelling anything prior to opening the bag.

¶ 21     On cross-examination by the State, Ridlen reiterated that he originally opened the passenger door of defendant's vehicle in an attempt to find insurance information. He did not smell anything at that point, but he could not recall whether that occurred before or after Kueker was in the vehicle.

¶ 22     Brady, as he did before, testified regarding his training related to methamphetamine. His training related to methamphetamine occurred at various times from 2006 through 2012. He testified that he viewed the substance inside the yellow bag but was not immediately able to identify it as being associated with methamphetamine.

¶ 23     Kueker's testimony was largely similar to that provided at the first hearing. He again testified that he smelled an odor he associated with methamphetamine production as soon as he opened the door of defendant's vehicle and that the odor "appeared" to be coming from the bag. The smell "reminded [Kueker] of the smell that [he] experience[d] during [his] internship." He confirmed that he moved the bag from the floorboard to the seat.

---

[1]The parties on appeal seem to agree, as apparently did the circuit court, that Ridlen was mistaken on this particular point.

¶ 24    Kueker testified that he grabbed the yellow bag and placed it on the driver's seat. He stated: "I could see that it looked granular through the bag." Kueker added: "I recognized the granulars [*sic*]." As it "became more apparent to [him] what it was," Kueker asked Ridlen to open the bag because Ridlen was wearing gloves.

¶ 25    The court denied defendant's motion to reconsider its earlier ruling.

¶ 26                        B. Suppression of Drug Test Results

¶ 27    While defendant's first motion to suppress was pending, he filed a second motion seeking to suppress the results of testing on defendant's blood and urine. In the motion, defendant alleged that while he consented to that testing, that consent was invalid where it was the product of his unlawful arrest.

¶ 28    At the hearing on the second motion to suppress, defendant testified that following the accident, he first spoke with Illinois State Police Trooper Dan Jansen. Sometime after his initial interaction with Jansen, defendant was conversing with his passenger, as well and his mother and cousin who had arrived at the scene. Jansen "came and got [defendant] *** and told [him] that [he] had to sit in [Jansen's] vehicle." Defendant was under the impression that this was a command, rather than a request. He did not feel free to refuse. Defendant sat in the front seat of the squad car for 20 to 30 minutes while Jansen was elsewhere.

¶ 29    When Jansen returned to the squad car, he "notified [defendant] that he needed to take [defendant] to St. Mary's Hospital to get a urinalysis and a blood draw." Jansen did not ask if he was willing to go and did not tell defendant that he was free to get a ride to the hospital from his mother or cousin. Jansen transported defendant to the hospital; at no point did defendant feel that he was free to opt out. He was not handcuffed and had not received any sort of citation.

¶ 30     At the hospital, but while still in the squad car, Jansen read to defendant the "Warning to Motorist" and requested that defendant sign it. He also cited defendant for failure to reduce speed. Jansen escorted defendant into the hospital and remained with him throughout the entirety of the visit. After the blood draw, Jansen told defendant that "he had to take [him] to the Knox County Jail" for an interview. Defendant never felt free to leave.

¶ 31     Sergeant Tucker of the Illinois State Police[2] testified that he arrived at the scene of the accident and acted as a liaison between the investigating troopers and command. After reviewing video from the scene, Tucker confirmed that he said, "We don't suspect DUI" and "We don't suspect anything impairmentwise." He further confirmed that, later on the video, he said "Right now it doesn't look like DUI. We're just doing Warning to Motorist."

¶ 32     Jansen testified that he did not place defendant in his squad car until transporting him to the hospital. He requested, rather than commanded, that defendant go to the hospital. Jansen testified that defendant was detained at that time because of "[t]he crash investigation, to conduct the *** Traffic Crash Warning to Motorist." Upon arrival at the hospital, Jansen cited defendant for failure to reduce speed and read him the traffic accident warning to motorist. He then asked if defendant consented to a urinalysis and blood draw. Defendant replied he would consent. At no point in the ensuing hospital visit did defendant withdraw his consent. Jansen did not raise his voice or draw his firearm.

¶ 33     On cross-examination, Jansen agreed that defendant was not free to go until he could be questioned by the accident reconstruction officers. Jansen also stated that defendant affirmatively

_____

[2]The report of proceedings refers to Tucker only as "Trooper Tucker."

consented to the transport to the hospital. He did not recall ever telling defendant that he was free to go.

¶ 34    In a written order, the court found that Jansen's conduct amounted to a detention because no reasonable person in defendant's position would have felt free to leave or otherwise terminate the encounter. It further characterized the detention as "improper" and "wrongful[ ]." As a factual finding, the court stated that defendant was transported to St. Mary's hospital "[a]fter approximately two and a half hours of sitting in Trooper Jansen's car." Despite these findings, the court found that defendant's consent was nevertheless voluntary. It denied the second motion to suppress.

¶ 35    Following the denial of both motions to suppress, defendant elected to proceed by way of stipulated bench trial. The evidence at the stipulated bench trial showed, *inter alia*, that both the urinalysis and blood test returned positive results for methamphetamine. The court found defendant guilty on both counts.

¶ 36    At sentencing, Kruzan's husband and two daughters provided victim impact statements regarding the loss of their wife and mother. Defendant's mother, Karen Lutz, testified that she noticed that defendant was crying at the scene of the accident. Lutz noted that although defendant had been in trouble before, she indicated that none of the prior incidents had changed defendant like this fatal accident. Defendant submitted documents from his insurance company showing that he had paid Kruzan's family for damage and loss of life caused by his actions. Defendant also submitted several articles and studies that tended to show that he was not impaired at the time of the accident as grounds to excuse his conduct.

9

¶ 37 The State argued in aggravation that defendant had 14 prior felonies. The State asked the court to sentence defendant to 25 years' imprisonment for unlawful possession of methamphetamine, and 30 years' imprisonment for aggravated DUI.

¶ 38 Defense counsel argued defendant was not impaired, based on the quantities of substances found in his blood and urine and the officers thought that defendant was not impaired at the scene. In allocution, defendant admitted that he ingested drugs a few days before the accident. Defendant acknowledged that he had a drug problem, but he felt that it would not affect anyone else as long as he did not drive while he was impaired. Defendant explained that he waited several days after ingesting drugs before he drove, and he believed he was sober at the time of the accident. Defendant took responsibility for his actions.

¶ 39 The court found in mitigation that defendant had compensated Kruzan's family for damage and loss of life, and that defendant had not contemplated that his conduct would cause or threaten serious harm to another. In aggravation, the court found that defendant had a history and pattern of prior criminal offenses and that the sentence imposed was necessary to deter others. Overall, the court noted that although defendant appeared remorseful and sorry, that

> "is something that cannot overcome what the balancing of all of the interests of justice are supposed to fully appreciate. In this particular case, we have the loss of a life. We have—inherent in defense. We have a substantial period of criminal history. And to be direct with you, [defendant], it is that history and those acts that is, again, a big aggravating factor under the statutory aspect."

The court sentenced defendant to 20 years' imprisonment on each conviction, to be served concurrently. Defendant appeals.

¶ 40                                    II. ANALYSIS

¶ 41                        A. Suppression of Methamphetamine

¶ 42      Defendant argues that the yellow bag in his vehicle was first seized, then searched in violation of the fourth amendment's prohibition against unreasonable searches and seizures. Specifically, he argues that the plain view doctrine, an exception to the fourth amendment's warrant requirement, is inapplicable because Kueker did not have the probable cause required to touch, move, or open the yellow bag.

¶ 43      The State does not dispute that a search and seizure occurred, nor does it dispute that both were conducted in the absence of a warrant. However, it argues that the search and seizure were justified under the plain view doctrine because probable cause existed to support those actions.

¶ 44      We review the denial of defendant's motions to suppress under a bifurcated standard of review. *People v. Bonutti*, 212 Ill. 2d 182, 188 (2004). We defer to the circuit court's findings of fact unless they are contrary to the manifest weight of the evidence. *Id.* We review *de novo* the ultimate legal question of whether the evidence in question should be suppressed. *Id.*

¶ 45      The fourth amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const., amend. IV. "[T]he 'essential purpose' of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials, including law enforcement officers, to safeguard the privacy and security of individuals against arbitrary invasions." *People v. Jones*, 215 Ill. 2d 261, 269 (2005) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979). Generally, this reasonableness standard requires a warrant supported by probable cause. *Id.*

"However, the United States Supreme Court has 'made it clear that there are exceptions to the warrant requirement. When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable.' " *Id.* (quoting *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)).

¶ 46        At issue in this case is the plain smell exception, an extension of the plain view exception to the fourth amendment's warrant requirement. The plain view exception has three requirements: (1) the officers must be lawfully in a position from which they view the object; (2) the incriminating character of the object must be immediately apparent; and (3) the officers must have a lawful right of access to the object. *Id.* at 271-72. "[I]f police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object, *i.e.*, if the incriminating character of the object is not immediately apparent, the plain view doctrine cannot justify the seizure." *Id.* at 272. The same is true of the "plain-smell doctrine," wherein the officer's olfactory observations must give rise to probable cause to justify a seizure. See *People v. Weaver*, 2013 IL App (3d) 130054, ¶¶ 27-32.

¶ 47        " '[T]he seizure of property in plain view involves no invasion of privacy and *is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity*.' " (Emphasis in original.) *Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (quoting *Payton v. New York*, 445 U.S. 573, 587 (1980)). "Probable cause is a practical, nontechnical concept that deals with the factual and practical considerations of everyday life on which reasonable and prudent persons—not legal technicians—act." *Jones*, 215 Ill. 2d at 274. Probable cause is a fluid concept and is not readily, or usefully, reduced to a neat set of legal rules. *Id.*

12

Probable cause for searches and seizures must be determined, in this instance, from the standpoint of the trooper, with his skill and knowledge being taken into account, and the subsequent credibility determinations must be made by the circuit court. *Id.*

¶ 48　　　　In the instant case, Kueker was lawfully in the cabin of defendant's vehicle while acting in his role as traffic accident reconstructionist. From that position, Kueker had lawful access to the yellow bag. While the appearance of the yellow bag was not incriminating, upon entering the vehicle Kueker immediately smelled a strong chemical odor emanating from the yellow bag. That odor was reminiscent "of the smell that [he] experience[d] during [his] internship" with the MRT. According to Kueker, that internship exposed him to multiple locations that were formerly used to manufacture methamphetamine. Because these locations were used to manufacture methamphetamine, they reasonably retained a very strong odor of the proceeds of their production—methamphetamine. Such an intense olfactory experience left a lasting impression on Kueker's senses such that the passage of 10 years did not dull Kueker's association. Kueker called upon this olfactory memory to establish probable cause to believe that the strong chemical odor emanating from the yellow bag was contraband warranting the subsequent search and seizure.

¶ 49　　　　Defendant argues that Kueker's testimony regarding the two-week internship was too vague and remote to provide Kueker with the necessary training and experience to determine that the smell emanating from the yellow bag was methamphetamine. However, our supreme court has refused to define the exact number of training hours or employment years necessary to render a member of law enforcement's belief reliable. *People v. Stout*, 106 Ill. 2d 77, 87 (1985). "The critical issue in each case is whether the situation that confronts an officer justifies the search." *Id.* at 86. Here, the situation presented to Kueker, an opaque yellow bag inside of a crashed vehicle

13

smelling strongly of a chemical odor reminiscent of locations where methamphetamine was manufactured, justified the search and seizure.

¶ 50       Further, Kueker did not need to specifically associate the chemical smell emanating from the yellow bag with methamphetamine, as he need only associate the smell with criminal activity. See *Brown*, 460 U.S. at 741-42. In relation to Kueker's experience, the smell need not be the odor of "cooked" or completed methamphetamine. The odor of the chemical precursors used to manufacture methamphetamine, which would have been present in the locations he experienced as an intern, would also give Kueker probable cause to investigate the yellow bag based on the potential criminal act of possessing methamphetamine manufacturing material. See 720 ILCS 646/30 (West 2016).

¶ 51       Finally, while there was some inconsistency between Kueker's testimony that he smelled the strong chemical odor upon entering the vehicle and Ridlen's testimony that he did not smell anything when he entered the vehicle and only smelled an odor after he opened the bag, this inconsistency presented a question of fact. The court, in its fact-finding role, reasonably resolved this question. The court did not err in denying defendant's motion to suppress the methamphetamine.

¶ 52                          B. Suppression of Drug Test Results

¶ 53       Defendant argues that the circuit court erred in denying his second motion to suppress because he was subjected to an unlawful seizure before consenting to urinalysis and blood testing, which voids his consent. The parties do not dispute that defendant was seized prior to providing his consent. The State argues defendant's seizure was lawful, as defendant was detained so that the officers could investigate a fatal vehicle accident, and defendant's consent was freely given.

14

¶ 54    Two types of citizen-police encounters implicate the fourth amendment: arrests and investigative stops. *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006). An officer making an arrest must have either probable cause to believe that the arrestee is committing or has committed a crime, or a warrant. *People v. Lee*, 214 Ill. 2d 476, 484 (2005). Under *Terry v. Ohio*, 392 U.S. 1, 22 (1968), an officer may also "briefly stop a person for temporary questioning." *Lee*, 214 Ill. 2d at 487; see also *Navarette v. California*, 572 U.S. 393, 396 (2014). Such a stop need only be supported by reasonable articulable suspicion, a quantum of suspicion lower than probable cause. *People v. Hackett*, 2012 IL 111781, ¶ 20. To justify a *Terry* stop, an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 21; see also 725 ILCS 5/107-14 (West 2016) (an officer may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit, or has committed an offense). "The difference between an arrest and a *Terry* stop is not the restraint on a person's movement but, rather, depends on the length of time the person is detained and the scope of the investigation that follows the initial encounter." *People v. Fields*, 2014 IL App (1st) 130209, ¶ 26.

¶ 55    Here, officers detained defendant to investigate a fatal vehicle accident. Jansen, who arrived shortly after the accident, testified that he detained defendant so that defendant could speak with the accident reconstructionist. This detention was supported by reasonable cause to believe that defendant had, at the least, committed a traffic infraction that caused the fatal accident. Due to the severity of the accident, this investigation was obviously longer than a typical traffic stop. See *Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984) (the brevity of a traffic stop mitigates the danger of compulsion to confess). Jansen reasonably detained defendant at the scene so that the

15

accident reconstructionist, Kueker, could conduct his investigation into the potential cause or causes of the accident. Whether Kueker spoke with defendant is irrelevant because, as long as the investigation progressed, there was the potential that Kueker or another officer may need to speak with defendant. Kueker never reached this point because he discovered the bag of suspected methamphetamine, which expanded the investigation. The methamphetamine provided additional reasonable suspicion to investigate whether: (1) defendant illegally possessed methamphetamine, and (2) defendant was under the influence of methamphetamine at the time of the accident. Logically, this additional reasonable suspicion required an extension of defendant's detention.

¶ 56　　　According to defendant, after he sat in the front seat of Jansen's patrol vehicle for 20 to 30 minutes, Jansen indicated that he needed to take defendant to the hospital for a urinalysis and blood draw. At this time, defendant remained lawfully detained due to the ongoing fatal vehicle accident investigation and the methamphetamine investigation. Due to the nature of the fatal accident and discovery of methamphetamine, the accident investigation warranted some form of chemical testing whether conducted at the scene of the accident or more safely conducted at a hospital.

¶ 57　　　Having found that defendant was in lawful custody, we must next determine whether his consent to the urinalysis and blood draw were voluntary. "Consent to a blood test need only be voluntary in order to provide a valid basis for an exception to the warrant requirement." *People v. Harris*, 2015 IL App (4th) 140696, ¶ 49. A defendant's consent is involuntary if " 'his will has been overborn and his capacity for self-determination critically impaired.' " *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). "[C]ustody alone does not render consent involuntary." *People v. Alvarado*, 268 Ill. App. 3d 459, 467 (1994). Factors determinative of whether a defendant's consent is voluntary include: the time of arrest, the use of force, whether the police used the custody to make multiple requests

16

for consent, and whether the custody was used as leverage, *i.e.*, the arrestee was told he would be released if he gave consent. *Id.*

¶ 58    Here, there is no indication that defendant's custody coerced his consent to the chemical testing. Defendant initially stood along the side of the road as the investigation progressed until Jansen asked him to sit in the front seat of his patrol vehicle. This location is important, as it is differentiated from the rear seat where arrestees are typically placed. According to defendant, he remained seated in the front seat for 20 to 30 minutes until Jansen returned and said that they were going to the hospital. There is no indication that Jansen brandished his weapon, used a commanding tone, placed defendant in handcuffs, or even moved defendant to the rear seat of the patrol vehicle before this ride. At the hospital, Jansen cited defendant for failure to reduce speed, read defendant the traffic accident warning to motorist, and then asked if defendant would consent to the urinalysis and blood draw. Jansen did not repeatedly ask for defendant's consent, nor did he suggest that defendant would be free to leave if he provided consent. Additionally, the warning to motorist did not invalidate defendant's consent as it informed defendant of the consequences should he refuse the testing. See *Harris*, 2015 IL App (4th) 140696, ¶ 50; 625 ILCS 5/11-501.6 (West 2016). Following the warning, defendant indicated his consent to the urinalysis and blood draw, walked freely into the hospital with Jansen, and submitted to the testing. On this record, there is no indication that defendant's will was overborne nor that his consent was involuntary. The court did not err in denying defendant's motion to suppress the drug test results.

¶ 59                                          C. Sentence

¶ 60    Defendant argues his 20-year prison sentence is excessive because it "does not reflect adequate consideration of the mitigating evidence or of the constitutional directive of returning offenders to useful citizenship."

17

¶ 61    We review the circuit court's sentencing decision for an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We will not substitute our judgment for that of the circuit court unless the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). A sentence within the statutory range is presumptively valid. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 27.

¶ 62    The court found defendant guilty of unlawful possession of methamphetamine, a Class X felony (720 ILCS 646/60(b)(4) (West 2016)), and aggravated DUI, a Class 2 felony that was enhanced to a Class X felony because defendant had two or more prior felony convictions (625 ILCS 5/11-501(a)(4), (d)(1)(F), (d)(2)(G) (West 2016); 730 ILCS 5/5-4.5-95(b) (West 2016)). Both Class X felonies carried sentencing ranges of 6 to 30 years' imprisonment. 730 ILCS 5/5-4.5-25(a) (West 2016). Defendant's 20-year sentences are well within this range, and therefore, are presumptively valid.

¶ 63    During the sentencing proceedings, the court must balance the nature of the offense, the need to protect the public, and defendant's rehabilitative potential. *Alexander*, 239 Ill. 2d at 213. The court does not need to expressly state its reasoning for a sentence. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. The fact that a court mentioned a factor in mitigation does not indicate that it ignored other factors. *People v. Burton*, 184 Ill. 2d 1, 34 (1998). The presence of mitigating factors neither requires a minimum sentence nor precludes the imposition of a maximum sentence. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51. The severity of the offense is the most important sentencing factor. *Alexander*, 239 Ill. 2d at 214.

¶ 64    The record establishes that the court considered all of the factors in mitigation and aggravation presented by the parties. Ultimately, the severity of the offenses, unlawful possession

18

of between 100 and 400 grams of methamphetamine and aggravated DUI resulting in a death, combined with defendant's substantial criminal history of 14 prior felony convictions, warranted the imposition of lengthy sentences. See *id.* In light of the severity of these offenses and associated loss of life, defendant's mitigating evidence likely saved him from an even greater sentence. Accordingly, the court did not abuse its discretion in sentencing defendant to concurrent terms of 20 years' imprisonment.

¶ 65                                    III. CONCLUSION

¶ 66        For the foregoing reasons, we affirm the judgment of the circuit court of  Knox County.

¶ 67        Affirmed.

¶ 68        JUSTICE HOLDRIDGE, dissenting:

¶ 69        I respectfully dissent from the majority's offering. For the reasons set forth below, I would find that the bag in the defendant's vehicle was seized and searched in violation of the fourth amendment and the defendant's consent to drug testing was tainted by his unlawful arrest.

¶ 70                          A. Suppression of Methamphetamine

¶ 71        The incriminating character of an object is immediately apparent for plain-view purposes where the viewing officer has probable cause to believe the object is contraband. As our supreme court has explained: "[I]f police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object, *i.e.*, if the incriminating character of the object is not immediately apparent, the plain view doctrine cannot justify the seizure." *Jones*, 215 Ill. 2d at 272. The same is true of the so-called "plain-smell doctrine," a corollary of plain view, wherein the officer's olfactory observations must give rise to probable cause in order to justify a seizure. See *Weaver*, 2013 IL App (3d) 130054, ¶¶ 27-32.

¶ 72    Probable cause—whether within the context of the plain view doctrine or not—exists where the facts and circumstances known to the officer would warrant a reasonable person to believe there is a reasonable probability that an object may be contraband or evidence of a criminal offense. *People v. Hill*, 2020 IL 124595, ¶ 24. "In determining whether the officer had probable cause, his factual knowledge, based on law-enforcement experience, is relevant." *People v. Smith*, 95 Ill. 2d 412, 419-20 (1983).

¶ 73    In *Jones*, our supreme court considered whether an officer's warrantless seizure of an object was justified by the plain view doctrine. *Jones*, 215 Ill. 2d at 271. During a lawful stop, the officer in that case noticed a small wooden box in the defendant's pocket. *Id.* In finding that the seizure comported with fourth amendment requirements, the court cited at length the officer's training and experience:

> "In this case, Gebke testified as to his training and experience. Gebke's training to become a state trooper included a weeklong course in drugs and drug detection. In this course, controlled substances were exhibited, along with drug paraphernalia that included containers such as 'one-hitter' boxes. This course was similar to prior training he received. Further, in his experience as an Illinois state trooper and previously as a Marissa police officer, Gebke had encountered 'one-hitter' boxes at least 24 times. In each of these instances, the box was used as drug paraphernalia and for no other purpose." *Id.* at 275.

The court continued:

> "We refuse to define the exact number of training hours or employment years necessary to render an officer's belief reliable. As stated earlier, what

constitutes probable cause for searches and seizures must be determined from the standpoint of the officer, with the officer's *skill and knowledge* being taken into account. [Citation.] We agree with the State that perhaps a reasonable civilian could fail to recognize a 'one-hitter' box as drug paraphernalia. However, civilians do not receive special training in drug paraphernalia and rarely encounter these boxes in their daily lives." (Emphasis in original.) *Id.*

¶ 74        Earlier, the supreme court, in *Stout*, 106 Ill. 2d at 87, held that an officer's testimony as to the odor of cannabis, when supported by evidence of the officer's training and experience in detecting such odors, can amount to probable cause. Applying *Stout* in *Weaver*, this court considered whether the "plain smell" of cannabis justified a seizure. *Weaver*, 2013 IL App (3d) 130054, ¶¶ 27-32. Noting that the officer "had extensive training in narcotics detection and drug trafficking, including how to detect the smell of raw cannabis," (*id.* ¶ 29) this court affirmed the circuit court's ruling denying the defendant's motion to suppress. *Id.* ¶ 32.

¶ 75        Here, Kueker testified that a strong chemical odor was apparent as soon as he opened the door to the defendant's vehicle. He was able to determine that the odor was emanating from the yellow bag on the floorboard. This testimony was undercut by Ridlen, who testified that he did not smell anything when he initially entered the vehicle to search for insurance information and also stated at the scene that he could smell the contents of the bag only after he opened the bag. Additionally, Kueker provided no explanation as to how he was able to determine where the smell originated.

¶ 76        While Kueker's primary observation related to the chemical odor, he also testified that the substance in the yellow bag appeared "granular" in nature. It is unclear how Kueker could

21

determine the granular nature of the material inside a bag that the circuit court found to be "opaque." More importantly though, Kueker provided absolutely no testimony as to what conclusions could be drawn from granularity, beyond the vague statement that he "recognized the granulars [*sic*]." There is nothing inherently incriminating about a granular substance, and Kueker offered no explanation as to how his training or experience might lead him to believe granularity was incriminating. Moreover, there was no testimony that such yellow bags were the type of bags typically used for drugs.

¶ 77　　　　Even setting these credibility concerns aside, Kueker's "training" was wholly insufficient for linking a general chemical odor to a reasonable suspicion that the substance was methamphetamine related. Kueker testified to no actual training regarding methamphetamines during his time working for the Illinois State Police. His suspicion hinged entirely on a student internship, completed some 10 years earlier, in which he spent 10 days observing the cleanup of "meth houses." That internship did not include any particular training relating to odor-detection, rather, Kueker purported to recognize the smell in the defendant's vehicle from that experience. While the majority states that Kueker was able to "associate the smell with criminal activity" (*supra* ¶ 50), I would find that this is not supported by Kueker's testimony. The "chemical smell" Kueker stated that he smelled while cleaning "meth houses" may have had nothing to do with the manufacturing of the methamphetamine—it could have been anything, including the cleaning products used. Even when asked by the State whether he had gained any other experience dealing with methamphetamines while working in law enforcement, Kueker responded: "On my area not really, no."

¶ 78　　　　The State argues: "While a civilian may not immediately recognize the strong chemical odor as methamphetamine, civilians do not receive special training in the chemical odors

22

associated with methamphetamine and rarely encounter such in their daily lives." This is undoubtedly correct. Of course, Kueker also had no special training in chemical odors associated with methamphetamine, and he affirmatively testified that he did not encounter methamphetamine in his daily life. While our supreme court has "refuse[d] to define the exact number of training hours or employment years necessary to render an officer's belief reliable," (*Jones*, 215 Ill. 2d at 275) Kueker's "training" in this case must fall below any possible threshold that could be set. His purported ability to match a smell he encountered during an internship 10 years ago pales in comparison to the officers' training detailed in *Jones*, *Weaver*, *Stout*, and the myriad of other cases addressing this issue.

¶ 79        Thus, I would find the State failed to establish that Kueker had undergone training that would render sufficiently reliable his belief that the strong chemical odor he detected was incriminating. The supposed recognition of a smell from 10 years earlier, by an untrained individual, is fundamentally insufficient to support a finding of probable cause that would justify a constitutional seizure. Because probable cause did not exist to seize and then search the yellow bag, the plain view exception to the warrant requirement is inapplicable. I, therefore, would reverse the circuit court's ruling denying the defendant's motion to suppress the contents of the yellow bag.

¶ 80                                B. Suppression of Drug Test Results

¶ 81        As the majority states, the parties agree that the defendant was seized before he provided his consent to urinalysis and blood testing but disagree on whether the seizure was lawful. As I would have found that the yellow bag in the defendant's vehicle was seized and searched in contravention of the fourth amendment, it follows that the bag and its contents may not serve as the basis for probable cause to arrest. See *Wong Sun v. United States*, 371 U.S. 471, 477-78 (1963).

23

Indeed, it is apparent that Jansen and the other law enforcement agents on the scene had no evidence to suggest the defendant had committed or was committing a criminal offense. There was simply no evidence to suggest that the defendant was impaired in any way or that there was any type of drugs in his system. In fact, it was stated repeatedly at the scene that the defendant was not suspected of being impaired.

¶ 82     The majority finds that the defendant was detained to investigate a fatal vehicle accident and that this detention was supported by reasonable cause to believe that the defendant had committed a traffic infraction. I disagree. While Jansen testified that he cited the defendant for failure to reduce speed, no facts were introduced into evidence explaining why this decision was made. Neither the fact of a traffic accident, nor the fact of the citation itself, supports probable cause. Even assuming, *arguendo*, that the mere fact of a rear-end collision gives rise to a reasonable, articulable suspicion that the rear driver failed to reduce speed, the State has still failed to demonstrate the reasonableness of the defendant's detention. No credible argument can be made that the entirety of the detention—from the defendant's time sitting in the squad car, to his transport to the hospital, to his time at the hospital, to his transport to and interrogation at the Knox County jail—was a "brief investigative stop[ ]" pursuant to *Terry*. See *Navarette*, 572 U.S. at 396. In fact, Jansen testified that the defendant was detained so that he could be questioned by the traffic accident reconstructionist and so he could be read the traffic accident warning to motorist. Yet, there was no evidence that Kueker ever questioned the defendant. And no explanation was provided as to why Jansen needed to transport the defendant to the hospital before reading him the warning. See *Terry*, 392 U.S. at 20 (investigative stop must be "reasonably related in scope to the circumstances which justified the interference in the first place").

24

¶ 83　　　　In sum, I would find that the facts known to Jansen at the time he detained the defendant supported neither probable cause nor a reasonable articulable suspicion to believe the defendant had committed a crime. As there was no justification for the defendant's arrest, that detention was unreasonable and in clear violation of the fourth amendment.

¶ 84　　　　I would further find that this unlawful seizure tainted the defendant's subsequent consent to testing. A person's voluntary consent may be so tainted by their unlawful detention as to render the consent invalid and require suppression of any evidence obtained pursuant to the consent. *Florida v. Royer*, 460 U.S. 491, 507-08 (1983); *People v. Brownlee*, 186 Ill. 2d 501, 521 (1999). However, the consent may also be found sufficiently attenuated from the unlawful detention, such that the consent is still valid. *People v. Delaware*, 314 Ill. App. 3d 363, 374 (2000). In determining whether consent was obtained through exploitation of the unlawful arrest, we must consider: "(1) the giving of *Miranda* warnings; (2) the temporal proximity of the arrest and consent; (3) the presence of any intervening circumstances; and (4) the purpose and flagrancy of the official misconduct." *Id.* (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

¶ 85　　　　There is no dispute that the defendant never received *Miranda* warnings. Somewhat less clear is the temporal proximity between the defendant's original arrest and his consent to blood and urine testing. While the defendant estimated that he sat in Jansen's squad car for 20 to 30 minutes, no direct evidence was adduced regarding the length of the trip from the scene of the accident to the hospital. Nevertheless, I would reasonably infer that the entire detention prior to the defendant's consent was not more than two hours. In *Brown*, the Supreme Court found that a passage of time of "less than two hours" between illegal arrest and confession weighed against a finding of attenuation. *Brown*, 422 U.S. at 604.

25

¶ 86    Next, while the drive from the scene of the accident to the hospital was an intervening circumstance, it is not a circumstance that favors a finding of attenuation. On the contrary, the defendant was asked to consent to drug testing after he had already been separated from his family and transported to the hospital for that very purpose. The transport only served to amplify the illegal detention and increase the likelihood that the defendant would consent to testing.

¶ 87    Finally, nothing especially flagrant can be found in the conduct of Jansen. However, the purpose behind that conduct is questionable. Primarily, it remains unclear why Jansen did not read the defendant the traffic warning to motorist, and request consent to testing, while still at the scene of the accident. As stated above, the act of separating the defendant from his family and transporting him to the hospital where testing would be conducted seems a purposeful attempt to induce the defendant's consent. See *id.* at 605 (finding that the illegal detention "had a quality of purposefulness" and that "[t]he arrest, both in design and in execution, was investigatory").

¶ 88    While a person is free to consent to a search or seizure, that consent is invalid where it is induced by an illegal and unconstitutional arrest. *Royer*, 460 U.S. at 507-08. In light of the foregoing facts, I would find that the defendant's consent to blood and urine testing was tainted by his illegal arrest, such that his consent was invalid. Absent the defendant's valid consent, the State raises no argument that police otherwise had probable cause to seize the defendant's blood and urine. Thus, I would reverse the circuit court's order denying the defendant's motion to suppress the blood and urine test results.

¶ 89    While my conclusions in this case may render it difficult for the State to prove the defendant guilty of the charged offenses, my concern in this appeal is not the defendant's actual culpability, or whether the State will be able to prove its case. Rather, my hands are tied by the constitutional mandates and their interpretations in caselaw. As the police did not act in accordance

26

with constitutional mandates, the evidence must be suppressed. I would, therefore, remand for further proceedings where the State may decide whether it can further pursue the charges without the suppressed evidence.